# NOTE:

## THIS IS A PARTIALLY SCANNED DOCUMENT.

## PLEASE SEE THE CASE FILE FOR ATTACHMENTS, EXHIBITS, AFFIDAVITS OR OTHER MATERIAL WHICH HAS NOT BEEN SCANNED.

L/HT

FILED
........ H.C.
2004 JUN 18 PM 2:48
W. DIST. OF N.C.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## ASHEVILLE DIVISION

|  |  |  |
|---|---|---|
| DAVID B. SWANSON, | * | |
| | * | |
| Plaintiff | * | |
| | * | Civil Action No. 1:03 CV 179 |
| v. | * | |
| | * | |
| MEDICAL ACTION | * | |
| INDUSTRIES INC., | * | |
| | * | |
| Defendant | * | |
| _____ / | | |

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Defendant, Medical Action Industries Inc., hereby moves for summary judgment

as to all counts in this action pursuant to Rule 56 of the Federal Rules of Civil Procedure

on the grounds that there are no issues of material fact requiring a trial on the merits, and

the Company is entitled to judgment as a matter of law. A Memorandum of Points and

Authorities in support of this Motion and a proposed Order are attached hereto.

Respectfully submitted,

Jonathan W. Yarbrough
N.C. State Bar No. 21316
CONSTANGY, BROOKS & SMITH, LLC
80 Peachtree Road, Suite 208
Asheville, NC 28803
Telephone: (828) 277-5137
Facsimile: (828) 277-5138

16

_Mark J. Swerdlin_

Mark J. Swerdlin
District of Maryland Bar No. 04927
SHAWE & ROSENTHAL, LLP
20 S. Charles Street, 11th Floor
Baltimore, MD 21201
Telephone: (410) 752-1040
Facsimile: (410) 752-8861

Attorneys for Defendant Medical
Action Industries Inc.

June 18, 2004

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### ASHEVILLE DIVISION

FILED
N.C.
2004 JUN 18 PM 2:48
U. DIST. OF N.C.

| | |
|---|---|
| DAVID B. SWANSON,      * | |
|                      * | |
|      Plaintiff     * | |
|                      * | Civil Action No. 1:03 CV 179 |
|     v.              * | |
|                      * | |
| MEDICAL ACTION      * | |
| INDUSTRIES INC.,       * | |
|                      * | |
|      Defendant    * | |

## DEFENDANT'S MEMORANDUM IN SUPPORT OF
## MOTION FOR SUMMARY JUDGMENT

Defendant, Medical Action Industries Inc., ("Medical Action or "the Company")
hereby moves for summary judgment as to all counts in this action pursuant to Rule 56 of
the Federal Rules of Civil Procedure on the grounds that there are no issues of material
fact requiring a trial on the merits, and the Company is entitled to judgment as a matter of
law.

## I.    INTRODUCTION

David Swanson suffers from a degenerative condition, osteoporosis of his lumbar
spine, that has deteriorated to the point that the Social Security Administration found him
totally disabled effective September 5, 2001. For several years Swanson's medication
regime has included Methadone and OxyContin, thereby rendering him unable to function
in the workplace. Although Swanson used to be able to work in a supervisory capacity at
the Company's Arden, North Carolina production facility, his responsibilities changed, as

did those of many other supervisors, when the Company adopted lean manufacturing principles in 2000/2001. As a result, his job became much more physical in nature. Regardless of whether he properly sought accommodation, which he did not, in 2001 he no longer was a Qualified Individual With a Disability as defined by the ADA. Accordingly, and as discussed below, his discharge for performance related reasons in September 2001 did not violate the ADA.

## II.     STATEMENT OF UNDISPUTED MATERIAL FACTS[1]

### A.     Background

1.     Medical Action develops, markets, and distributes a variety of surgical related products. It is headquartered in New York and has a manufacturing, warehousing and distribution facility in Arden, North Carolina.

2.     The Company employed David Swanson from April 15, 1991 to September 6, 2001. He began as a Quality Control Inspector and eventually moved up to Second Shift (3:00p.m.--11:00p.m.) Supervisor. As Second Shift Supervisor he was the highest-ranking person in the building for the majority of the second shift and was generally responsible to see that production ran smoothly (Tr. 34-35).[2]

---

[1] For purposes of this Motion, all facts as recounted by Swanson are assumed to be true. If this case proceeds, Medical Action does not waive the right to contest facts that are subject to dispute.

[2] Excerpts from Swanson's deposition are attached hereto as Ex. 1.

3. Swanson has suffered from osteoporosis of his lumbar spine since the late 1980's (Tr. 230). The condition has gotten progressively worse (Tr. 231-33). His current medication regime includes Methadone, OxyContin, Norflex, Zoloft, Forteo, and Prevacid (Tr. 7-8). The last two years the osteoporosis has led into osteoarthritis, causing pain in his knees, finger joints, ankles and elbows (Tr. 319-21).

4. In the years leading up to his final year (2001) with the Company, Swanson reported to Production Manager Mark Frampton and then his replacement, Cindy Bell. For the last year of his employment Swanson reported to Dennis Knaupp, Production Manager, except for a brief period before Knaupp was named the Production Manager. During that time Swanson reported directly to the General Manager, Bill Gilbert (Tr. 25-26).

5. During the end of 2000 and beginning of 2001 the Company implemented "lean manufacturing principles." Lean manufacturing is based on matching efficient production methods with efficient use of labor. Accordingly, the Company endeavored to produce only as much product as it needed on a particular day to satisfy customer orders. By doing so, the Company could best utilize raw materials and inventory space. The Company also sought to better utilize labor, essentially doing more with less personnel (Tr. 95-99). In that regard, the Company dramatically reduced headcount, especially in the use of temporary employees. (Griffin Affidavit, ¶ 2, attached hereto as Ex. 2).

6. Consistent with the Company's efforts to operate more efficiently with less personnel, the Company reduced its workforce through attrition and decreased use of temporary employees. Headcount figures dropped from 254 in April 2000 to 179 as of

3

August 2001. In addition, as a result of increased production efforts, the Company's gross monthly sales divided by total employees increased from $26,536.32 per employee in April 2000 to $54,008.30 per employee in August 2001. (Ex. 2, ¶ 3). As a result of this fundamental change in the way the Company did business, for approximately the last year of Swanson's employment he assumed an additional role besides Shift Supervisor, that of PDI Team Lead (Tr. 23-24, 37-38, 57).

7.      Swanson admitted that while he functioned as a Shift Supervisor the Company accommodated his osteoporosis by excusing him from "counter" duty during annual inventory because counters were required to lift product (Tr. 237). He also admitted that prior to the implementation of lean manufacturing his Production Managers Frampton, and then Bell, allowed him to utilize material handlers for any lifting he could not perform (Tr. 245-46, 264). [3] In fact, Swanson admitted that for years his Managers honored whatever requests he made regarding not being able to do something at work due to his back (Tr. 265-66, 270). Swanson also knew that the Company accommodated other employees' medical restrictions (Tr. 291).

## B.      The PDI Team Lead Position and Swanson's Physical Limitations

8.      The PDI team worked on three production machines: the PDI machine that produced sterilization bags, a glove machine that produced plastic gloves and a small pouch machine that produced smaller sterilization bags (Tr. 38-39, 46). The PDI machine

---

[3] In 1997 Swanson broke his neck on an amusement park ride but worked during the six-week period he wore a neck brace. Swanson readily admitted that the Company accommodated him, telling him to let it know if there were any duties he could not perform (Tr. 82-84, 265).

required one machine operator, two packers and a mechanic that was shared with another production team (Tr. 39-40). One packer operated the glove machine (Tr. 44-45). (Sometimes the PDI Team also ran the "Quantech" pouch machine (Tr. 46-47)). As PDI Team Lead, Swanson supervised the production on the three machines and oversaw the employees assigned to the team (Tr. 37-46).

9.  Swanson spent approximately 25% of his time performing shift supervisor duties and the remaining 75% performing PDI Team Lead duties (Tr. 37, 48).

10.  The Shift Supervisor role did not involve physical labor (Tr. 48-49).

11.  Swanson claimed that the PDI Team Lead role was very physical because he was often filling in for production employees or helping out on the machines. Among other tasks he had to:

- pick up and move boxes weighing up to 55 pounds up to 80-100 times/shift;
- in connection with making boxes, lift inner packers weighing 10 to 50 pounds up to six times/shift;
- in connection with pulling orders, maneuver top webs, bottom webs and inner packers, weighing up to 200 pounds each, from the warehouse to the production area using forklifts or other mechanical devices, three days/week;
- put rolls of material weighing up to 400 pounds on a hand truck and return them to the warehouse at least every shift (Tr. 50-57, 73-76).

12.  Swanson estimated that such physical activities comprised approximately two-thirds of his typical 8-hour shift (Tr. 280, 290).

13.  Swanson realized that under lean manufacturing the Company did not employ surplus material handlers (Tr. 60-61, 64) and that the Material Handlers were

fully occupied with their assigned duties (Tr. 297-98). Swanson did not tell his supervisor (Knaupp or Gilbert) that due to his osteoporosis he needed help from the material handlers (Tr. 61-63). Swanson claims that Knaupp told him in early 2001 that material handlers had their own jobs to do and did not have time to help him lift items (Tr. 246-48). Swanson did not go to Wayne Griffin, Human Resources Manager, or Gilbert about Knaupp's alleged comment or to seek an accommodation because he did not want to "stab" Dennis in the back, but could not explain any basis for holding that belief (Tr. 67, 248-53, 269-70).

14. By letter dated June 12, 2001, Swanson's internist, Dr. Virginia Barnhardt, advised that Swanson could not lift or move objects weighing over 25 pounds (Dep. Ex. 11, copy attached as Ex. 3). Swanson claimed that Knaupp asked him how he was going to perform his job with that restriction and Swanson simply replied that he would do his best (Tr. 274-75). Swanson admits, however, that he did not try to discuss the need for an accommodation with Knaupp. He further admits that he did not contact Gilbert, Griffin, or anyone at the Company's headquarters to request an accommodation (Tr. 275-76, 293). That is so even though Swanson knew personnel at headquarters, including Paul Meringolo, the Company's CEO, and Richard Satin, Vice President and General Counsel, and knew about the Company's "Open Door Policy." (Dep. Ex. 3, p. 3.11, copy attached as Ex. 4; Tr. 260-61).

15. Subsequent to providing the June 12th note, Swanson did not ask Knaupp for material handlers to assist him with the physical aspects of his job (Tr. 285-87).

16.     Swanson claims he was able to keep performing his job by taking increased levels of medication and getting some help on occasion from other employees (Tr. 293-94). As of July/August 2001, however, Swanson's osteoporosis was so bad that he had to crawl on his hands and knees in the morning to get to the bathroom in order to take his pain medications (Tr. 256-57). Several hours after taking his medications he was able to go to work and perform the physical labor that resulted in his being forced to crawl on his hands and knees the following day (Tr. 256-57).

17.     At an appointment with Dr. Barnhardt in August she suggested that Swanson look into a career change (Tr. 300, 408). By note dated August 7, 2001, Dr. Barnhardt further limited Swanson's weight restriction to 10 pounds, to include "pulling" as well (Dep. Ex. 12, copy attached as Ex. 5). Swanson claimed that Knaupp asked what it meant and Swanson stated "it meant what it says" (Tr. 303-04). Swanson admits again, however, that he did not further discuss this matter with Knaupp or contact Gilbert, Griffin, or anyone at the Company's headquarters to request an accommodation (Tr. 306).

18.     Swanson admits that he has no idea how he could have performed his job given his physical condition and lifting restrictions (Tr. 298).

## C.     Swanson's Termination

19.     The Company terminated Swanson's employment effective September 6, 2001 due to his failure to adapt to and satisfy lean manufacturing principles. Although the document was not presented to him at his termination meeting, Dep. Ex. 10 sets forth the basis for the decision (copy attached as Ex. 6). Among other performance issues, the following were noted:

- An inability to adapt to the new demands and requirements, revealed through productivity and efficiency reports.

- Lack of follow-through.

- An abdication of his management role regarding decisions on schedule changes, personnel issues, disciplinary issues, coaching/mentoring of team leads, overtime requirements and decisions that may required more knowledge of the business than a team lead may possess.

- Lack of involvement to assist with resolution of issues that temporary employees had with Company employees.

- Mislabeling of work orders by Swanson's PDI Team

- Shutting down other machines to cover for absence on the PDI Team resulting in loss of production

- Refusing to communicate his intention or decision pertaining to overtime when asked by his peers and team members resulting in high levels of frustration within the team

- Failure to demonstrate ability to function as part of a team despite receiving coaching from several different levels of the organization including the Office of Manufacturing Excellence, Organizational Effectiveness and Team Facilitator.

- Failure to follow through with SOPs for processes and application of headcount.

20.     Swanson did not tell Griffin or Knaupp at the termination meeting that he could not perform his job due to physical restrictions (Tr. 411).  Nor did he advise anyone at the Company 's headquarters about that fact (Tr. 411-12).

### D.     Swanson Files for Disability Benefits

21.     Shortly after his termination, on November 16, 2001, Swanson filed an application for disability benefits under the Social Security Act.  Swanson agreed that the "Third Party Activities of Living Questionnaire" his wife completed is accurate. Swanson's wife indicated that Swanson is no longer able to lift anything, needs help out

8

of the car and off of the toilet, has trouble remembering things, and is in chronic or bad pain all of the time. (Dep. Ex. 14, copy attached as Ex. 7; Tr. 325-34).

22.    By letters dated May 31, 2002 and August 11, 2002, Dr. Barnhardt wrote that Swanson's severe osteoporosis is expected to be permanent. (Dep. Exs. 16 and 17, copies attached as Exs. 8 and 9).

23.    By Findings dated September 22, 2003, an Administrative Law Judge determined that Swanson has been disabled since September 5, 2001. (Dep. Ex. 15, copy attached as Ex. 10).  In addition, the ALJ, among other findings, held:

> 1.    The claimant [Swanson] has not engaged in substantial gainful activity since September 5, 2001.
>
> 2.    The medical evidence establishes that the claimant has the following severe impairments:  osteoporosis, multiple compression fractures, chronic mechanical back pain, and depression.
>
> 6.    The claimant is unable to perform the requirements of his past relevant work.
>
> 11.   The claimant has been under a disability, as defined in the Social Security Act, since September 5, 2001 (20 CFR §404.1520(f)).

Swanson agrees with those findings (Tr. 334-41).  The ALJ's decision relied in part on Dr. Barnhardt's July 31, 2003 assessment that Swanson "is totally disabled.  This is a straightforward case," and on **Swanson's sworn testimony** that:

- he was having pain 24 hours a day, seven days a week, which was absolutely unbearable at times;
- he had to lie down for fifteen minutes at a time, at least two times per day;
- that he could only walk for 10 minutes due to multiple fractures and pain in his back;

- that he was unable to remember or think clearly.

(Ex. 10).

24.     Swanson is optimistic that Forteo, one of the drugs he is on currently, will enable him to reduce his pain medication to such extent that he could consider working again. <u>Until and unless that occurs, however, the combination of the pain he suffers along with the methadone and oxycotin he takes makes it impossible for Swanson to function in the workplace</u> (Tr. 350-51,355). Swanson has been taking Forteo for about one year (Tr. 341-43). Swanson is also precluded from full-time employment at this time because of his care-giver responsibilities for his wife (Tr. 348).

**E.     Swanson Files a Charge of Discrimination with the EEOC**

25.     By Determination dated January 30, 2003, the EEOC found probable cause that the Company violated the ADA in terminating Swanson because it allegedly failed to place Swanson on notice of his job performance deficiencies. The EEOC found no probable cause, however, concerning Swanson's claim that the Company failed to accommodate his lifting restrictions (EEOC Determination attached hereto as Ex. 11).

26.     The EEOC's probable cause finding is flawed because the Company verbally advised Swanson of his performance deficiencies. Moreover, because the Company knew about and tolerated Swanson's back problems for years, there is no basis to suggest a nexus between his termination and his osteoporosis. In addition, the Company's policies and procedures do not require progressive discipline (Ex. 4) and the absence of such discipline is not indicative of a discriminatory motive. Nor do the

Company's policies require written notification of performance deficiencies to managerial level employees.

**F.  Medical Action's Relevant Policies**

27.  Medical Action takes claims of discrimination very seriously and maintains policies against discrimination and harassment.  The Company's Employee Handbook contains summaries of these and other Company policies.  (Ex. 4).  Swanson acknowledges he received the Employee Handbook.  (Tr. 27-28; Dep. Exs. 1, 2, copies attached as Ex. 12 and 13).

28.  Medical Action's EEO statement, which appears in the Employee Handbook, provides that it is Medical Action's policy "to recruit, hire, train and promote employees without discrimination based on…disability…." (Ex. 4, p. 3.8).

29.  Medical Action also maintains an Open Door policy, which instructs an employee with an issue or a complaint, to:

1.  Contact your supervisor to discuss the issue.
2.  Your supervisor will provide you with a decision regarding your issue or complaint.
3.  If you disagree with your supervisor's decision, you may request a meeting with your supervisor's superior so that you can discuss your issue or complaint.
4.  You may continue to appeal decisions you do not agree with up through successive levels of management until you reach an executive officer of Medical Action.  (Ex. 4, p. 3.11).

30.  Swanson admits that he did not complain pursuant to the Company's Open Door Policy (Tr. 408, 412-13).

## III. LEGAL ARGUMENT

### A. STANDARD FOR SUMMARY JUDGMENT UNDER RULE 56.

The moving party is entitled to summary judgment if it can demonstrate that: (1) there is no genuine dispute as to any material fact; and (2) summary judgment is appropriate as a matter of law. Anderson v. Liberty Lobby Inc., 477 U.S. 242, 248 (1986). If the non-moving party fails to make a showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," then the district court is required to grant summary judgment. Celotex Corporation v. Catrett, 477 U.S. 317, 322-24 (1986). In order to meet this burden, the non-moving party must produce evidence that would permit the district court to conclude that a fair-minded jury could return a verdict for that party on the evidence presented. "The mere existence of a scintilla of evidence in support of the Plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the Plaintiff." Anderson at 250.

In Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574 (1986), the Court stated that, if a plaintiff's claim is in the judge's view "implausible" and "makes no . . . sense," a plaintiff "must [in order to defeat summary judgment] come forward with more persuasive evidence to support [his] claim than would otherwise be necessary." Matsushita at 587. In that case, the Court held that, if the moving party makes a compelling case for summary judgment, the party opposing summary judgment must "tend to exclude the possibility" that the defendant's actions were for legitimate rather

than illegitimate reasons. <u>Matsushita</u> at 588. <u>See also</u> <u>Felty v. Graves-Humphreys Co.</u>, 818 F.2d 1126, 1128 (4th Cir. 1987).

The United States Court of Appeals for the Fourth Circuit has echoed this guidance, instructing trial judges that they have "an affirmative obligation . . . to prevent 'factually unsupported claims and defenses from proceeding to trial.'" <u>Id</u>. Medical Action submits that such an affirmative obligation exists here, and that, for the reasons set forth below, the Motion for Summary Judgment should be granted.

### B. PLAINTIFF CANNOT ESTABLISH A *PRIMA FACE* CASE OF DISABILITY DISCRIMINATION

#### 1. The Essential Elements of a *Prima Facie* Case

The Americans with Disabilities Act (ADA) prohibits discrimination "against a qualified individual with a disability ("QIWD") because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions and privileges of employment." 42 U.S.C. § 12112(a). The Act defines a "qualified individual with a disability" as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." <u>Id</u>. §12111(8).

In order to state a *prima facie* claim for relief under the ADA, a plaintiff must establish (1) that he is disabled within the meaning of the Act; (2) that he is otherwise qualified for the job in question (able to perform the essential functions of the job with or without reasonable accommodation which he must describe); and (3) that the employer

13

terminated him because of his disability. <u>Doe v. University of Maryland Medical System Corporation</u>, 50 F. 3d 1261, 1265 (4th Cir. 1995); <u>Tyndall v. National Educ. Ctrs. Inc. of California</u>, 31 F.3d 209, 212 (4th Cir. 1994). If a plaintiff produces evidence sufficient to make a facial showing that accommodation is possible, the burden of production shifts to the employer to present evidence of its inability to accommodate. If the employer presents such evidence, the plaintiff has the burden of coming forward with evidence concerning his individual capabilities and suggestions for possible accommodations to rebut the employer's evidence. As with discrimination cases generally, the plaintiff at all times bears the ultimate burden of persuading the trier of fact that he has been the victim of illegal discrimination based on his disability. <i>See</i> <u>St. Mary's Honor Ctr. v. Hicks</u>, 113 S.Ct. 2742, 2747-49 (1993); <u>Tyndall</u>, 31 F.3d at 213.

### 2. Swanson Cannot Establish That He Is Otherwise Qualified for the Job

Medical Action concedes that Swanson suffers from a disability. Summary judgment should be granted in Medical Action's favor, however, because Swanson is not a QIWD and therefore cannot establish the second element of the *prima facie* case.

Swanson cannot establish that he is a QIWD because he cannot perform the essential functions of his former position with Medical Action, with or without reasonable accommodation. Specifically, according to Swanson, he spent approximately 75% of his day performing PDI Team Lead duties, which he characterized as "very physical" (Tr. 37, 48). Among other tasks, he had to pick up and move boxes weighing up to 55 pounds up to 80-100 times/shift; in connection with making boxes, lift inner

packers weighing 10 to 50 pounds up to six times/shift; in connection with pulling orders, maneuver top webs, bottom webs and inner packers, weighing up to 200 pounds each, from the warehouse to the production area using forklifts or other mechanical devices, three days/week; put rolls of material weighing up to 400 pounds on a hand truck and return them to the warehouse at least every shift (Tr. 50-57, 73-76). Swanson estimated that such physical activities comprised approximately two-thirds of his typical 8-hour shift (Tr. 280, 290).

As of July/August 2001 Swanson's osteoporosis was so bad that he had to crawl on his hands and knees in the morning to get to the bathroom in order to take his pain medications (Tr. 256-57). Several hours after taking his medications he was able to go to work and perform the physical labor that resulted in his being forced to crawl on his hands and knees the following day (Id.). As discussed above, Swanson had lifting and pulling restrictions of 10 pounds at the time of his termination in September 2001. (Ex. 5). **Swanson admits that has no idea how he could have performed his job given his lifting restrictions** (Tr. 298).

The ADA does not require employers to modify essential functions of a job in order to make an accommodation for individuals who are not physically capable of performing them. 42 U.S.C. § 12111(8); McCullough v. Atlanta Beverage Co., 929 F. Supp. 1489, 1500 (N.D. GA. 1996); Jasany v. U.S. Postal Serv., 755 F. 2d 1244, 1250-51 (6th Cir. 1985). As the Fourth Circuit Court of Appeals has stated, "the duty of reasonable accommodation does not encompass a responsibility to provide a disabled employee with alternative employment when the employee is unable to meet the demands

15

of his present position." Myers v. Hose, 50 F.3d 278, 284 (4th Cir. 1995). Swanson's admission that he has no idea how he could have performed his job given his lifting restrictions speaks for itself. Given the status of Swanson's physical limitations at the time of his discharge, he cannot demonstrate that he could meet the physical demands of his position.

The burden of requesting the accommodation is on the employee and Swanson further admits that he did not request an accommodation, or make a complaint pursuant to Medical Action's Open Door policy. Crow v. McElroy Coal Co., 290 F.Supp.2d 693 (N.D.W.Va. 2003) (citing Gantt v. Wilson Sporting Goods, 143 F.3d 1042, 1046 (6th Cir.1998)). Swanson merely asserts that he is optimistic that Forteo, one of the drugs he is on currently, will enable him to reduce his pain medication to such extent that he could consider working again **in the future**. Until and unless that occurs, however, the combination of the pain he suffers along with the methadone and oxycotin he takes makes it impossible for Swanson to function in the workplace (Tr. 350-51, 355). Reasonable accommodation does not require the employer to wait indefinitely for an employee's medical condition to be corrected. Myers v. Hose, 50 F.3d 278, 283 (4th Cir.1995). In Crow the Court found that plaintiff did not state a claim for failure to accommodate because the plaintiff did not request an accommodation at the time of his termination, nor anytime thereafter. 290 F.Supp.2d 693.

Based on the foregoing, Swanson is unable to establish that he was a QIWD within the meaning of the ADA. Tyndall, 31 F.3d at 212. Therefore, Medical Action is entitled to judgment as a matter of law.

16

### 3. Swanson Cannot Establish that Medical Action Terminated Him on the Basis of his Disability

Swanson also cannot establish the third element of his *prima facie* case (i.e. that Medical Action terminated him because of his disability). As discussed more fully above, Swanson was terminated for his failure to adapt to and satisfy lean manufacturing principles. He had a number of performance problems including, but not limited to, a lack of follow-through, an abdication of his management role regarding decisions required by a shift supervisor and PDI team lead, mislabeling of work orders, refusing to communicate his intentions or decisions pertaining to overtime, failure to demonstrate an ability to function as part of a team despite receiving coaching from several different levels of the organization, and failure to follow through with SOPs for processes and application of headcount.

Swanson cannot establish a causal connection between his disability and his termination. First, Swanson has suffered from osteoporosis of his lumbar spine since the late 1980's and his condition has gotten progressively worse (Tr. 230-33). Swanson admitted that the Company had consistently accommodated his osteoporosis in the past (i.e. by excusing him from "counter" duty during annual inventory because counters were required to lift product (Tr. 237), allowing him to utilize material handlers for any lifting he could not perform (Tr. 245-46, 264), etc.).[4] In fact, Swanson admitted that for years his Managers honored whatever requests he made regarding not being able to do

---

[4] Swanson readily admitted that the Company accommodated him in 1997 after he broke his neck, telling him to let it know if there were any duties he could not perform (Tr. 82-84, 265).

something at work due to his back (Tr. 265-66, 270). Swanson further admitted that he knew other employees' medical restrictions that the Company accommodated (Tr. 291). Additionally, Swanson admitted that he did not tell Griffin or Knaupp at the termination meeting that he could not perform his job due to physical restrictions (Tr. 411). Nor did he advise anyone at the Company 's headquarters about that fact (Tr. 411-12). Nor can Swanson dispute that the Company dramatically reduced its head count as a result of the implementation of lean manufacturing and that there were not other personnel around to perform the essential functions of his job.

Thus, there is no causal nexus between Swanson's termination and his disability and Medical Action is entitled to summary judgment. See Marshall v. Wal-Mart Stores, Inc., 2001 WL 420381*10 (W.D. Va. 2001) (defendant entitled to summary judgment because plaintiff failed to point to any circumstance surrounding his discharge that credibly raised an inference of unlawful discrimination) (copy attached as Ex. 14); Shiflett v. GE Fanuc Automation Corp., 960 F.Supp. 1022, 1031 (W.D.Va.1997) (Court found plaintiff failed to establish a causal connection between his termination and disability noting "all too many leaps and unjustifiable inferences must be made before one can reasonably conclude that any causal connection exists between plaintiff's termination and his disability.)

### C. MEDICAL ACTION HAD LEGITIMATE, NONDISCRIMINATORY BUSINESS REASONS FOR TERMINATING PLAINTIFF.

Assuming, *arguendo*, that Swanson can make out a *prima facie* case of disability discrimination, the burden shifts to Medical Action to demonstrate a legitimate,

nondiscriminatory reason as to its actions toward him. <u>Doe v. University of Maryland</u> <u>Medical System Corporation</u>, 50 F.3d 1261, 1265 (4th Cir. 1995).

As described more fully above, Swanson was terminated due to his failure to adapt to and satisfy lean manufacturing principles, for improperly abdicating his management role when issues arose with the individuals he supervised and for not being a team player. His disability simply was not a factor.

This is further supported by the lack of causal connection between Swanson's disability and his termination. As Swanson testified, he has suffered from osteoporosis of his lumbar spine since the late 1980's (Tr. 230) and for years his Managers honored whatever requests he made regarding not being able to do something at work due to his back (Tr. 265-66, 270). Finally, Swanson knew that the Company accommodated other employees' medical restrictions (Tr. 291). In short, there is no evidence, other than Swanson's naked assertions, that his termination had anything to do with his disability. Medical Action had a long history of accommodating Swanson's disability and has accommodated others with disabilities.

### D.   PLAINTIFF'S ASSERTIONS BEFORE THE SOCIAL SECURITY ADMINISTRATION FURTHER PRECLUDE HIS RECOVERY UNDER THE ADA

Swanson's testimony before the Social Security Administration ("SSA") and Swanson's physician, Dr. Barnhardt's representations as to Swanson's disability further establish that Swanson is not a QIWD under the ADA. Specifically, Dr. Barnhardt's May 31, 2002 and August 11, 2002 letters (relied on by the SSA's Administrative Law Judge (ALJ)) noted that Swanson's severe osteoporosis is expected to be permanent.

(Exs. 8 and 9). The SSA's ALJ presiding over Swanson's claim determined that he has been disabled since September 5, 2001 (one day before his termination was effective) (Ex. 10) relying in part on Dr. Barnhardt's July 31, 2003 assessment that Swanson "is totally disabled. This is a straightforward case." In addition, the ALJ's Rationale for granting Swanson's disability benefits relied on **Swanson's sworn testimony** that:

- he was having pain 24 hours a day, seven days a week, which was absolutely unbearable at times;
- he had to lie down for fifteen minutes at a time, at least two times per day;
- that he could only walk for 10 minutes due to multiple fractures and pain in his back;
- that he was unable to remember or think clearly.

(Ex. 10). Swanson further agreed that the "Third Party Activities of Living Questionnaire" his wife completed in support of his SSDI claim is accurate. That form indicated that Swanson is no longer able to lift anything, needs help out of the car and off of the toilet, has trouble concentrating and remembering things, and is in chronic or bad pain all of the time. (Ex. 7; Tr. 325-34).

While receiving Social Security Disability Insurance ("SSDI") payments does not automatically preclude Swanson from being considered a QIWD under the ADA, he must explain how the prior assertions are not inconsistent. Cleveland v. Policy Mgmt. Sys. Corp., 526 U.S. 795, 797, 806 (1999). The Supreme Court explained:

An ADA plaintiff cannot simply ignore her SSDI contention that she was too disabled to work. To survive a defendant's motion for summary judgment, she must explain why that SSDI contention is consistent with her ADA claim that she could "perform the essential functions" of her previous job, at least with "reasonable accommodation." *Id.* at 798.

Swanson has offered no explanation for the inherent conflict between his ADA claim and

his representations before the SSA. Therefore, his claim must be dismissed. Crow v.

McElroy Coal Co., 290 F.Supp.2d 693 (N.D.W.Va. 2003) (plaintiff's complaint was

dismissed for failure to state a claim of disability discrimination where he failed to proffer

any explanation for the apparent factual contradictions between his SSDI claim and his

ADA claim).

In a factually analogous case, Feldman v. American Memorial Life Insurance Co.,

196 F. 3d 783 (7th Cir. 1999), the plaintiff asserted in her SSDI application that she was

"completely and totally disabled and cannot perform any substantial gainful

employment," declared that she could "barely move" and "could not work a six to eight

hour day because of pain, stiffness and fatigue." Id. at 791. The Feldman Court noted

that the plaintiff's "declarations appear on their face to contradict her argument before the

district court on her ADA claim that she was a qualified individual who could perform

the essential functions of her job as a traveling salesperson." Id. The Court further

reasoned:

> As we once explained, "[w]hen employees (and/or their physicians)
> represent that they are 'totally disabled,' 'wholly unable to work,' or some
> other variant to the same effect, employers and factfinders are entitled to
> take them at their word." [internal citation omitted]. In her SSDI
> application, Feldman convinced the SSA of her total disability with
> unambiguous statements about her total incapacity to perform any
> substantial gainful employment. Feldman now explains flatly that she
> "was able to perform the essential functions of her job, with or without
> reasonable accommodations and, thus, was a 'qualified individual." This
> bald statement, without more, crashes face first against her claim of total
> disability in her SSDI application. We cannot permit litigants to adopt an
> alternate story each time it advantages them to change the facts. Feldman

> presented no explanation of the contradiction between her statements
> before the SSA and her statements to the district court on her ADA claim.

See also Motley v. New Jersey State Police, 196 F.3d 160, 167 (3rd Cir. 1999)(summary judgment was proper where plaintiff's prior assertions of total disability were inconsistent with his ADA claim); Mitchell v. Washington Central School, 190 F.3d 1, 7 (2nd Cir. 1999) (plaintiff's prior inconsistent statements to SSA and in workers' compensation proceeding judicially estopped him from advancing ADA claim); Voisin v. Georgia Gulf Corp., 245 F. Supp. 2d 853, 862 (M.D. La. 2002) (medical evidence submitted to disability insurers and SSA left no doubt that Voisin was totally disabled and could not perform any function of his job, therefore precluding him from asserting a viable ADA claim); Kerns v. Dura Mechanical Components, Inc., 618 N.W. 2d 56, 62 (Mich. 2000) (plaintiff's representations to SSA and Workers' Compensation Board made clear that he was not qualified for the position due to his physical ailments, and therefore barred his recovery for his contradictory disability discrimination claims).

Based on the above authority and Swanson's lack of explanation regarding the inherently conflicting nature of his representation before the SSA and his ADA claim, Medical Action is entitled to judgment as a matter of law.

### E.    THE COURT IS NOT BOUND BY THE EEOC'S DETERMINATION OF PROBABLE CAUSE

The EEOC found probable cause to believe that the Company violated the ADA in terminating Swanson because it allegedly failed to place him on notice of his job performance deficiencies, while finding no probable cause concerning Swanson's claim that the Company failed to accommodate his lifting restrictions (Ex. 11). The EEOC's

22

probable cause finding is flawed because the Company verbally advised Swanson of his performance deficiencies. Moreover, Swanson's testimony establishes that the Company knew about his back problems for years and consistently accommodated his condition. Accordingly, there is no basis to suggest a nexus between his termination and his osteoporosis. In any event, the Company's policies and procedures do not require progressive discipline (Ex. 4) and the absence of such discipline is not indicative of a discriminatory motive. Nor is there any Company requirement to provide written notification of performance deficiencies to managerial level employees.

The Court is not bound by the EEOC's erroneous and inconsistent "cause" determination with respect to Swanson's termination as the Court's standard of review on all substantive issues is de novo. Fields v. Lang, 705 F. Supp. 1134, 1136 n. 3 (D. Md. 1988)(citing Chandler v. Roudebush, 425 U.S. 840, 863 (1976)). As the Court noted in Rosenfeld v. Department of the Army, 769 F.2d 237, 239 (4th Cir. 1985):

> Federal anti-discrimination statutes embody a strong presumption in favor of judicial resolution of disputed questions of fact. Prior administrative findings, whatever result may be reached, are ordinarily not entitled to preclusive effect in a subsequent discrimination suit, even thought the same facts are in dispute. Whether the prior administrative findings be those of the Civil Service Commission, the EEOC, or any other federal agency is immaterial...Congress entrusted the ultimate resolution of questions of discrimination to the federal judiciary.

Thus, the Court should, based on the evidence presented herein, reach a determination free from the EEOC's flawed finding.

## IV. CONCLUSION

Based upon the above, Medical Action respectfully requests that the Court dismiss the Complaint with prejudice in its entirety, award the Company the costs it has incurred in connection with this motion, and grant it such other, further and different relief as the Court may deem just, proper and equitable.

Respectfully submitted,

Jonathan W. Yarbrough
N.C. State Bar No. 21316
CONSTANGY, BROOKS & SMITH, LLC
80 Peachtree Road, Suite 208
Asheville, NC 28803
Telephone: (828) 277-5137
Facsimile: (828) 277-5138


Mark J. Swerdlin
District of Maryland Bar No. 04927
SHAWE & ROSENTHAL, LLP
20 S. Charles Street, 11th Floor
Baltimore, MD 21201
Telephone: (410) 752-1040
Facsimile: (410) 752-8861

Attorneys for Defendant Medical
Action Industries Inc.

June 18, 2004

#98778

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that he is an attorney at law licensed to practice in the State of North Carolina, is attorney for Medial Action Industries Inc. in the above-captioned matter, and is a person of such age and discretion as to be competent to serve process, and that he has today served a copy of DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, MEMORANDUM IN SUPPORT THEREOF AND EXHIBITS by depositing a copy hereof in a postpaid wrapper in a post office or official depository under the exclusive care and custody of the United States Post Office, properly addressed to the said party.

This the 18 day of June, 2004.

Jonathan W. Yarbrough
N.C. State Bar No. 21316
CONSTANGY, BROOKS & SMITH, LLC
80 Peachtree Road, Suite 208
Asheville, NC 28803
Telephone: (828) 277-5137
Facsimile: (828) 277-5138

ADDRESSEE:

David B. Swanson
126 Big Brown Road
Mars Hill, NC 28754

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### ASHEVILLE DIVISION

DAVID B. SWANSON,

            Plaintiff

       v.

MEDICAL ACTION
INDUSTRIES INC.,

          Defendant

Civil Action No. 1:03 CV 179

**ORDER**

Having considered Defendant's Motion for Summary Judgment and any opposition and reply thereto, it is this _____ day of _____, 2004 ORDERED that Defendant's Motion BE and HEREBY IS GRANTED.

_____
United States District Court Judge

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### ASHEVILLE DIVISION

DAVID B. SWANSON,                    *
                                     *
        Plaintiff      *
                                     *     Civil Action No. 1:03 CV 179
        v.             *
                                     *
MEDICAL ACTION                       *
INDUSTRIES INC.,                     *
                                     *
        Defendant       *
_____/

## EXHIBITS TO
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

1.    Excerpts from Swanson Deposition

2.    Affidavit of Wayne E. Griffin

3.    Dr. Barnhardt's letter dated June 12, 2001 (Exhibit 11 to Swanson Deposition)

4.    Medical Action Industries Employee Handbook (Exhibit 3 to Swanson Deposition)

5.    Dr. Barnhardt's note dated August 7, 2001 (Exhibit 12 to Swanson Deposition)

6.    Personnel Memorandum (Exhibit 10 to Swanson Deposition)

7.    Third Party Activities of Daily Living Questionnaire (Exhibit 14 to Swanson Deposition)

8.    Dr. Barnhardt's letter dated May 31, 2002 (Exhibit 16 to Swanson Deposition)

9.    Dr. Barnhardt's letter dated August 11, 2002 (Exhibit 17 to Swanson Deposition)

10.   Administrative Law Judge's Findings dated September 22, 2003 (Exhibit 15 to Swanson Deposition)

11. EEOC Determination dated January 30, 2003

12. Acknowledgment of Employee Handbook (Exhibit 1 to Swanson Deposition)

13. Receipt of Employee Handbook (Exhibit 2 to Swanson Deposition)

14. *Marshall v. Wal-Mart Stores, Inc.*, 2001 WL 420381*10 (W.D. Va. 2001)